Lussier v. Subaru of N.E., et al.     CV-99-109-B    08/03/01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


George Lussier Enterprises, Inc.
d/b/a Lussier Subaru, et al.

   v.                                    Civil No. 99-109-B
                                         Opinion No. 2001 DNH 143
Subaru of New England, Inc., et al.


MEMORANDUM AND ORDER


A number of current and former New England Subaru dealers bring this class action against their distributor, Subaru of New England, Inc. ("SNE"), its sole shareholder and President, Ernest Boch, and its Executive Vice President and General Manager, Joseph Appelbe. The dealers allege that Boch, Appelbe, and SNE have engaged in an "option-packing scheme," by which they used their power to allocate or withhold certain desirable vehicles to coerce the dealers to purchase unwanted accessories. The dealers claim that this practice breaches their dealer contracts and violates federal antitrust laws, the federal RICO statute, the federal Automobile Dealer Day in Court Act, and various state dealer protection statutes. The dealers now move pursuant to

Federal Rule of Civil Procedure 23 to certify a class of approximately 75 current and former New England Subaru dealers, (Doc. No. 168). For the reasons discussed below, I grant in part, and deny in part, plaintiffs' motion for class certification.

## I.  BACKGROUND

SNE is the exclusive distributor of Subaru vehicles in New England. In this capacity, it has entered into franchise agreements with all of the region's Subaru dealers. The franchise agreements contain or incorporate by reference certain standard provisions dictated by Subaru's national distributor, Subaru of America, Inc. One such provision states that, "[i]t is understood and agreed that [SNE] will allocate all affected Subaru products equitably, using appropriate factors such as the respective inventory levels and sales performance of [its] dealers during a representative period of time immediately prior to such allocation." SNE Dealership Agreement and Standard Provisions, Ex. F to Defs.' Surreply Memo. in Opposition to Pls.' Mot. for Class Certification (hereinafter "Defs.' Surreply"), (Doc. No. 187), ¶ 11.3.

SNE implemented a vehicle distribution plan on February 1, 1987, dubbed "Fair Share II."  See Fair Share II Distribution System (hereinafter "Fair Share II"), Ex. 1 to Aff. of Phillip L. Lustbader (hereinafter "Lustbader Aff."), submitted with Defs.' Objection to Pls.' Motion for Class Certification (hereinafter "Defs.' Objection"), (Doc. No. 180).  Under this plan, SNE allocates 90% of its vehicles to dealerships based upon a formula tied to the number of vehicles each dealership sells during a given allocation period.  The plan specifies that SNE may withhold the remaining "discretionary vehicles" and use them for "executive vehicles and discretionary purposes such as market action vehicles."[1]  Fair Share II at 000012.

The dealers allege that at some point after they had incurred substantial costs to develop their dealerships, SNE began to: (1) condition a dealer's access to discretionary vehicles on the dealer's agreement to purchase non-discretionary vehicles with unwanted accessories, such as leather seats and

_____

[1]  The plan elsewhere defines "discretionary vehicles" as "[v]ehicles to be used as demonstrators by [SNE]; vehicles to be used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of [SNE], need assistance and vehicles delivered to VIPs."  Fair Share II at 000027.

keyless entry systems; and (2) accessorize discretionary vehicles before offering them to dealers, thereby effectively conditioning a dealer's purchase of a discretionary vehicle on the purchase of the pre-installed accessories. The dealers characterize this practice as an "option-packing scheme."

Because SNE withholds a disproportionate number of Subaru's most popular vehicles as discretionary vehicles, the dealers contend that they have little choice but to accede to SNE's demands. The discretionary vehicles are essential to the financial well-being of many dealers because of SNE's concerted effort to make dealers financially dependent on SNE by, among other things, conditioning franchise renewal on an agreement not to sell vehicles other than Subarus.

As a result of the defendants' practices, the dealers allegedly have been forced to purchase an average of $480 in unwanted accessories on each vehicle SNE has allocated and sold to the dealers. Pls.' Second Amended Complaint ("Cplt."), (Doc. No. 147), ¶¶ 26, 30, 34, 69. Since many customers did not want these accessories and the accessories themselves were priced by SNE at above-market rates, many dealers were forced to sell these accessorized vehicles at a loss.

After the dealers raised these concerns, SNE responded by stating that: (1) it does pre-accessorize "demonstrator" vehicles "and any discretionary vehicles determined in accordance with current allocation procedures;" (2) it accessorizes "one or two of the first new models delivered to each dealer" so that dealers and customer "have an opportunity to see the choices that are available" for each new model; and (3) while it recognized that SNE's District Service Managers ("DSM's") may become somewhat aggressive in selling accessories to dealers, SNE instructs DSM's never to coerce dealers into buying unwanted accessories. SNE's Responses to Dealer Proposals (hereinafter the "SNE Response"), Ex. 2 to Pls.' Mot. for Class Certification (hereinafter "Pls.' Motion"), (Doc. No. 168), at 7.

The named plaintiffs subsequently brought this action, asserting claims based upon defendants alleged "option packing" scheme. Plaintiffs contend that defendants' conduct constitutes a tying arrangement prohibited by Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C. §§ 1 & 14. They also allege that defendants violated: (1) the Automobile Dealer Day in Court Act, 15 U.S.C. § 1221 et seq.; (2) the automobile dealer protection statutes of Connecticut, Massachusetts, Maine, New

Hampshire, Rhode Island, and Vermont; and (3) the dealer agreements entered into between SNE and dealers. Lastly, plaintiffs contend that defendants furthered their scheme through a pattern of extortion and mail fraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[2]

Plaintiffs now seek to certify as a class "those entities or individuals who own or owned a New England Subaru dealership between January 1, 1995 and the present." Cplt. ¶ 44.

## II. CLASS CERTIFICATION STANDARDS

To certify a proposed class, plaintiffs first must satisfy the four prerequisites of Rule 23(a) by showing that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims

---

[2] I described many of plaintiffs' factual allegations and legal claims in more detail in two previous orders. See George Lussier Enters., Inc. v. Subaru of New England, Inc., Civil No. C-99-109-B, 2000 DNH 013, 2000 WL 1466132 (D.N.H. Jan. 13, 2000) (granting motion to dismiss prior RICO claims against SNE; granting in part and denying in part motion to dismiss prior RICO claim against Boch); George Lussier Enters., Inc. v. Subaru of New England, Inc., Civil No. C-99-109-B, 1999 WL 1327396 (D.N.H. Dec. 13, 1999) (denying motion to dismiss antitrust claim against SNE).

-6-

or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If the plaintiffs satisfy those requirements, they must then show that the proposed class also meets the characteristics of at least one of the three categories provided in Rule 23(b). The plaintiffs bear the burden of establishing all of the requirements for class certification. See Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 1987).

In evaluating a motion for class certification, a court must undertake a rigorous analysis of the factual and legal issues comprising the plaintiffs' cause of action in order to determine whether the requirements of Rule 23 have been met. See General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160-61 (1982); Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978). A court should also consider the defendant's proposed defenses. See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000). While a court may not decide the merits of a case at the class certification stage, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974), a court may "formulate some

prediction as to how specific issues will play out in order to determine" whether class certification is appropriate. Mowbray, 208 F.3d at 298.

With these principles in mind, I analyze plaintiffs' motion for class certification.

### III. ANALYSIS

Plaintiffs contend that their complaint satisfies the Rule 23(a) prerequisites and is eligible for class action treatment under either Rule 23(b)(2) or Rule 23(b)(3). I examine each contention in turn.

### A. Rule 23(a) Standards

#### 1. Numerosity

Plaintiffs must first demonstrate that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); see General Tel. Co. of the Northwest v. EEOC, 446 U.S. 318, 330 (1980) ("The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."). A court should consider both the number of members in the proposed class and their

geographical distribution in determining whether the proposed class satisfies the numerosity requirement.  See Andrews v. Bechtel Power Corp., 780 F.2d 124, 131-32 (1st Cir. 1985).  Since the proposed class includes approximately seventy-five present and former Subaru dealers scattered throughout New England, I find that the proposed class satisfies the numerosity requirement.  See 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.05, at 3-25 (3d ed. 1992) (observing that it is generally impracticable to join 40 plaintiffs and therefore a class of 40 should normally satisfy the numerosity requirement) (hereinafter "Newberg").

2.    Commonality

To establish the commonality prerequisite, the plaintiffs must show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Because the class need share only a single legal or factual issue at this stage of the analysis, the commonality requirement ordinarily is easily satisfied.  See Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 625 (5th Cir. 1999), cert. denied, 120 S.Ct. 1169 (2000); 1 Newberg § 3.10, at 3-50.  The reality that differing fact patterns underlie the claims of individual class members will not

-9-

necessarily prevent a finding of commonality, so long as the class members have at least one issue in common.  See Hart v. Valdez, 186 F.3d 1280, 1288 (10th Cir. 1999); Curtis v. Comm'r, Maine Dept. of Human Servs., 159 F.R.D. 339, 341 (D. Me. 1994).

The record reveals numerous questions of law and fact common to the class, including: (1) whether SNE installed accessories on discretionary vehicles prior to offering those vehicles to dealers; (2) whether SNE conditioned the purchase of discretionary or non-discretionary vehicles on the purchase of accessories; and (3) whether SNE has the contractual right to pre-accessorize vehicles.  Accordingly, I find that the proposed class satisfies the commonality requirement.

3.  Typicality

To satisfy the typicality requirement, the class representatives' injuries must arise from the same event or course of conduct as the injuries of other class members, and their claims must be based on the same legal theories.  See Modell v. Eliot Sav. Bank, 139 F.R.D. 17, 22 (D. Mass. 1991).  In this case, the named plaintiffs allege the same injury as each member of the plaintiff class: they allege that they suffered financial harm because SNE forced them to purchase expensive,

unwanted accessories as a condition of purchasing discretionary and non-discretionary vehicles. Thus, in trying their case, the named plaintiffs will necessarily present the claims of the absent plaintiffs. See Priest v. Zayre Corp., 118 F.R.D. 552, 555 (D. Mass. 1988). Accordingly, I find that the proposed class satisfies the typicality requirement.

4. Adequacy

The fourth and final prerequisite of Rule 23(a) is that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this prerequisite, plaintiffs must show: (1) "that the interests of the representative party will not conflict with the interests of any of the class members;" and (2) that the counsel chosen by the representative party is "qualified, experienced[,] and able to vigorously conduct the proposed litigation." Andrews, 780 F.2d at 130.

Defendants advance two reasons why the named plaintiffs can not adequately represent the class. First, defendants argue that while those dealers who do not receive discretionary vehicles are harmed by SNE's alleged practice of option-packing, those dealers who do receive coveted discretionary vehicles actually benefit

-11-

from SNE's practices.  According to defendants, such a class of "winners and losers" is not appropriate for class certification. See Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993) (affirming denial of certification where some class members benefitted from disputed settlement agreement and "those benefits would evaporate if the class action succeeded"). I reject this argument because it ignores the fact that, if plaintiffs' allegations are true, even those dealers who were "winners" because they received discretionary vehicles, were still "losers" because they made less profit on those vehicles than they would have made on non-accessorized vehicles.

Second, defendants argue that the named plaintiffs can not fairly and adequately protect the interests of the class because the class consists of both former and current dealers.  According to defendants, former dealers will be interested only in money damages, while current dealers will be more concerned with the financial stability of SNE and will therefore be more interested in obtaining injunctive relief.  See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337-39 (4th Cir. 1998).

I disagree.  The current group of named plaintiffs includes both current dealers, e.g., Sullivan County Motors, Inc., and

former dealers, e.g., George Lussier Enterprises, Inc. Accordingly, they should be able to decide among themselves what remedy would adequately and fairly represent the interests of both groups within the class. See McMahon Books, Inc. v. Willow Grove Assocs., 108 F.R.D. 32, 36-37 (E.D. Pa. 1985) (certifying a class consisting of current and former mall tenants despite potential differences regarding damages). Moreover, in the event of a finding of liability, I will be able to resolve any conflict within the class regarding damages by the formation of subclasses at the relief stage. See id. at 36; 1 Newberg § 3.25, at 3-136-38 ("Many courts have held that speculative conflict should be disregarded at the class certification stage;" and that such conflicts are properly dealt with at the relief stage.).

As to the second half of the adequacy analysis, I conclude, after reviewing the affidavits and declarations submitted by the named plaintiffs' counsel, that plaintiffs' counsel are experienced in the conduct of complex commercial litigation, including class actions. These affidavits and declarations, along with their conduct in this litigation thus far, give me no reason to doubt their competence or ability to vigorously conduct this litigation. See Andrews, 780 F.2d at 130. Accordingly, I

-13-

find that the named plaintiffs are represented by competent, experienced counsel who will vigorously conduct this litigation.

In sum, I find that the named plaintiffs will fairly and adequately represent the class.

Since plaintiffs satisfy all of the Rule 23(a) prerequisites, they must now show that a class action is an appropriate procedural method for maintaining this suit under one of the Rule 23(b) categories.

## B.    Rule 23(b)(2) Standards

Plaintiffs seek a declaratory judgment that SNE does not have the right to pre-accessorize discretionary vehicles.  They also seek an injunction preventing SNE from pre-accessorizing discretionary vehicles in the future.  Therefore, plaintiffs contend that class certification is appropriate under Rule 23(b)(2), which provides that an action may be maintainable as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The Advisory Committee Note to Rule 23(b)(2), however,

provides that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Rules Advisory Comm. Note to Amended Rule 23, 39 F.R.D. 98, 102 (1996). Accordingly, a court may certify a class under Rule 23(b)(2) only if injunctive or declaratory relief is the predominant remedy sought by the class. See Barnes v. American Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998) (citing 1 Newberg § 4.11, at 4-39); Allison v. Citgo Petroleum Corp., 151 F.3d 402, 411 (5th Cir. 1998) (collecting cases); Rothwell v. Chubb Life Ins. Co. of Am., 191 F.R.D. 25, 29 (D.N.H. 1998).

Plaintiffs assert that their claims for injunctive and declaratory relief are equally as important to them as their claims for monetary damages. After reviewing plaintiffs' complaint and the record as a whole, however, it is apparent that plaintiffs' primary goal is to obtain monetary damages: they assert a number of federal and state law claims seeking compensatory damages, punitive damages, attorneys' fees, and costs. See Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 978 (5th Cir. 2000) ("The mere recitation of a request for [equitable] relief cannot transform damages claims into a Rule 23(b)(2) class action."); Allison, 151 F.3d at 415 (holding that "monetary

-15-

relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief."). Although plaintiffs also seek injunctive and declaratory relief, any such relief is clearly secondary to their multiple claims for monetary relief. See Allison, 151 F.3d at 415; Rothwell, 191 F.R.D. at 29. Consequently, I find that certification under Rule 23(b)(2) is not appropriate.

C.   **Rule 23(b)(3) Standards**

Rule 23(b)(3) establishes two criteria for class certification. First, common questions of law or fact must predominate over questions affecting individual class members. Fed. R. Civ. P. 23(b)(3). Second, a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Id. These two requirements ensure that class certification is granted "only where the adjudication of common issues in a single action will achieve judicial economies and practical advantages without jeopardizing procedural fairness." Rothwell, 191 F.R.D. at 29 (citations omitted).

I begin by examining the second Rule 23(b)(3) factor, superiority, which requires a comparative evaluation of the

alternatives to class certification to determine whether a class action is more or less fair, practical, and efficient than the other available means of adjudication. See 1 Newberg § 4.27, at 4-106. The obvious alternative to class certification in this case would be for the dealers to bring individual suits against the defendants. Such individual litigation would be grossly inefficient as the parties, witnesses, and courts would be forced to endure duplicative litigation. See id. § 4.30, at 4-121 ("A class action will ordinarily be superior to repetitive individual suits."). Individual litigation would be costly, time consuming, and could potentially result in inconsistent judgments.

Defendants contend, however, that individual dealers have a strong interest in "controlling the prosecution of . . . separate actions" against them. Fed. R. Civ. P. 23(b)(3)(A). I note, however, that no putative class members have opposed certification. See Riordan v. Smith Barney, 113 F.R.D. 60, 66 (N.D. Ill. 1986). Moreover, not all dealers have the financial resources necessary to bring individual suits against SNE. Other dealers might be unwilling to do so, out of concern that such litigation would jeopardize their important, ongoing relationship with SNE. Thus, I find that the advantages of class treatment

outweigh any potential interest in individual litigation.  See 1 Newberg § 4.29, at 4-119.

In addition, I note that the proposed class is relatively small, consisting of approximately seventy-five former and current dealers, and is confined to the states of New England. These factors suggest that trying this case as a class action would be manageable.  See Fed. R. Civ. P. 23(b)(3)(D); 1 Newberg § 4.33, at 4-135-36.  Moreover, given the court's familiarity with the legal issues raised by this case, it is desirable to concentrate the litigation of plaintiffs' claims in this court. See Fed. R. Civ. P. 23(b)(3)(C); Riordan, 113 F.R.D. at 66.

I next address the issue of predominance.  No precise, mechanical test exists to determine whether common issues predominate in a proposed class.  See Mowbray, 208 F.3d at 296; Rothwell, 191 F.R.D. at 29.  Instead, courts look for "a sufficient constellation of common issues [that] binds class members together."  Mowbray, 208 F.3d at 296.  The predominance requirement is satisfied when "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof."  Rutstein v. Avis Rent-A-Car Sys.,

-18-

Inc., 211 F.3d 1228, 1233 (11th Cir. 2000), cert. denied, 121
S.Ct. 1354 (2001) (quoting Kerr v. City of West Palm Beach, 875
F.2d 1546, 1558 (11th Cir. 1989)); see Lockwood Motors, Inc. v.
General Motors Corp., 162 F.R.D. 569, 580 (D. Minn. 1995)
(observing that simultaneous, class-wide proof "obviates the need
to examine each class member's individual position"); see also 1
Newberg § 4.25, at 4-86.

Plaintiffs claim that they suffered financial losses as a
result of defendants' policy of option-packing. While each
dealer made his or her own decision about whether or not to
purchase particular vehicles and accessories, plaintiffs claim
that defendants forced all dealers to purchase unwanted,
expensive accessories through a standardized, company-wide
policy. Plaintiffs contend that they can offer common proof that
SNE adopted and implemented this policy. Defendants argue,
however, that because of the nature of plaintiffs' claims,
individual questions, such as the question of whether a dealer
wanted to purchase a particular vehicle or accessory or whether
he was coerced into doing so, will predominate over questions
common to the class. I examine each of plaintiffs' claims in
turn. I limit my initial analysis to questions of liability and

discuss the issue of damages in Section D _infra._

1.  The "Announced" Tying Claim

Plaintiffs allege that defendants conditioned dealers' access to discretionary vehicles (the tying product) on their purchase of accessories (the tied product) for those discretionary vehicles.  Dealers needed the discretionary vehicles to maintain their Subaru franchises (the lock-in product) in which they had already invested substantial capital. _See generally_ _Eastman Kodak Co. v. Image Technical Servs., Inc.,_ 504 U.S. 451, 461-80 (1992) (discussing "lock-in" tying claims); _Lee v. Life Ins. Co. of N. Am.,_ 23 F.3d 14, 16-20 (1st Cir. 1994) (same).

In order to prevail on a tying claim, plaintiffs must show: (1) that the tying and tied products are actually two distinct products; (2) that the seller conditioned the right to purchase the tying product on the purchase of the tied product; (3) that the seller has sufficient market power in the market for the tying product to appreciably restrain trade in the market for the tied product; and (4) that, as a result, the seller is able to foreclose a not insubstantial amount of interstate commerce in the tied product.  _See_ _Borschow Hosp. and Med. Supplies, Inc. v._

<u>Cesar Castillo Inc.</u>, 96 F.3d 10, 17 (1st Cir. 1996) (quoting <u>Data General Corp. v. Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1178 (1st Cir. 1994)); <u>George Lussier Enters., Inc.</u>, 1999 WL 1327396, *2; <u>see also</u> <u>Grappone, Inc. v. Subaru of New England, Inc.</u>, 858 F.2d 792, 794 (1st Cir. 1988) (observing that the essential elements of a tying claim are the same under §1 of the Sherman Act and §3 of the Clayton Act).

Plaintiffs contend that because they plan to offer common proof of their announced tying claim, class certification is appropriate. While plaintiffs do not specifically address how they will attempt to prove the first and fourth elements of their tying claims, the defendants do not seriously dispute that both elements are readily amenable to common proof.[3] <u>See</u> <u>Visa</u>

---

[3] At the class certification hearing, defendants argued, for the first time, that plaintiffs would be unable to offer common proof of the information and switching costs necessary to prove the market-power element of a lock-in tying claim. Transcript ("<u>Tr.</u>") of Hearing on Jan. 29, 2001, (Doc. No. 219), at 69, 110-11; <u>see</u> <u>George Lussier Enters., Inc.</u>, 1999 WL 1327396, *3-5 (discussing information and switching costs). Since defendants did not brief this issue, however, I need not dwell on it here. I find, however, that because a number of other common questions predominate over individual questions in this case, plaintiffs' need to prove switching and information costs does not defeat a finding of predominance. <u>See</u> <u>Collins v. Int'l Dairy Queen, Inc.</u>, 168 F.R.D. 668, 676 (M.D. Ga. 1996) (certifying lock-in tying claim without directly addressing the issue of

Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 87 (E.D.N.Y. 2000) (finding that the question of distinctness is amenable to common proof); Little Caesar Enters., Inc. v. Smith, 172 F.R.D. 236, 266 (E.D. Mich. 1997) (finding that the question of the seller's effect on interstate commerce was common to the class). Accordingly, I focus my analysis on the element of conditioning.

### a.   Conditioning

Before specifically addressing plaintiffs' announced tying claim, I first discuss conditioning in general and the concept of the announced tie in particular.

Conditioning is central to the nature of a tying claim: "[b]y conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgement as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 605 (1953); see Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) ("Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of

_____

switching and information costs); see also Mowbray, 208 F.3d at 298.

-22-

its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.").

To prove "conditioning," plaintiffs must show that defendants conditioned plaintiffs' ability to purchase vehicles, the product that plaintiffs really wanted (the "tying product"), on the purchase of accessories, a product that plaintiffs may not have wanted (the "tied product"). See Borschow Hosp. & Med. Supplies, Inc., 96 F.3d at 17 (plaintiffs must offer proof of "an agreement or condition, express or implied, that establishes a tie." (quoting Data General Corp., 36 F.3d at 1178)); George Lussier Enters., Inc., 1999 WL 1327396, *2.

The parties disagree as to whether plaintiffs can prove conditioning through proof common to the class or whether they will have to offer the testimony of individual dealers in an attempt to show that SNE forced them to purchase unwanted accessories as a condition to purchasing vehicles. The parties do agree, however, that common proof of conditioning would ensure that common issues predominate, rendering class certification appropriate, while individualized proof of conditioning would

-23-

render class certification inappropriate. See, e.g., Chase Parkway Garage, Inc. v. Subaru of New England, Inc., 94 F.R.D. 330, 332 (D. Mass. 1982) (denying class certification where plaintiffs offered individualized proof of conditioning); Rental Car of New Hampshire, Inc. v. Westinghouse Elec. Corp., 496 F. Supp. 373, 378 (D. Mass. 1980) (stating that certification is appropriate only where a proposed class can offer common, not individualized, proof of conditioning).

(i). The "Announced Tie"

One way for a class of plaintiffs to prove conditioning is to point to an express contractual tie: an agreement that explicitly conditions the purchase of one product on the purchase of another. See, e.g., Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1131 (6th Cir. 1981); Ungar v. Dunkin' Donuts of Am., Inc., 531 F.2d 1211, 1224 (3d Cir. 1976) (stating that a formal agreement is sufficient, but not necessary, to prove conditioning); see generally ABA Section of Antitrust Law, Antitrust Law Developments Vol. I, 187-88 (4th ed. 1997); P. Areeda and H. Hovencamp, Antitrust Law Vol. X, ¶ 1753, at 292-94 (1996) (hereinafter "Areeda").

Courts agree that class certification of a tying claim is

appropriate where conditioning can be proved by establishing that all class members were subject to the same express contractual tying agreement. See, e.g., Bogosian v. Gulf Oil Corp., 561 F.2d 434, 452-53 (3d Cir. 1977); Rental Car of New Hampshire, Inc., 496 F. Supp. at 378; Schuler v. Better Equip. Launder Center, Inc., 74 F.R.D. 85, 87 (D. Mass. 1977).

In their treatise on antitrust law, Professors Areeda and Hovencamp suggest another means of proof, a corollary to the contractual tying agreement which they call an "announced tie."[4]

---

[4] While few cases actually use the term "announced tie," but see, e.g., Little Caesar Enters., Inc., 172 F.R.D. at 265 ("The commonality of proofs of a tie-in is an easy issue where there is an express contractual tie or an announced tie-in."), the case law suggests that a non-contractual statement can create an inference of conditioning. See, e.g., Bogus v. Am. Speech & Hearing Ass'n, 582 F.2d 277, 287 (3d Cir. 1978) (finding conditioning where association's internal rule required membership in the organization in order to be eligible for professional certification); B.J.L.M. Liquor Store, Inc. v. Block Distrib. Co., Civ. A. No. L-85-64, 1987 WL 13811, *2 (S.D. Tex. Apr. 2, 1987) (assuming that non-contractual statement constituted an attempted tying arrangement); Martino v. McDonald's Sys., Inc., 81 F.R.D. 81, 88-89 (N.D. Ill. 1979) (finding that conditioning could be shown on a class-wide basis where employee testified that he told 99% of prospective franchisees that a tying condition existed because this evidence established a "firm policy" of conditioning); see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 192 (2d Cir. 1992) (holding that company's policy statement did not establish tying arrangement because it was ambiguous and the plaintiff offered no evidence that it was ever implemented).

See Areeda ¶ 1753a, at 292; ¶ 1754, at 301-06.  Under this theory, when a seller announces that he will condition the purchase of a tied product on the purchase of a tying product, any sale made subsequent to that announcement is presumed to be a tied sale because the announcement creates the impression among buyers that the tying condition exists.  Id. ¶ 1754b, at 302-03; ¶ 1754d, at 305-06.  Thus, proof of the announcement creates an inference of conditioning.  Id. ¶ 1754d, at 305-06.

Professors Areeda and Hovencamp suggest, however, that this inference could be rebutted if a defendant offers evidence "that the announcement was not taken seriously," including, for example, evidence showing: (1) "widespread knowledge that defendant actually sold" the tied and tying products separately or "did not terminate dealers who purchased" the tied product elsewhere; or (2) "that buyers frequently and successfully requested" that the tied and tying products be offered separately.  Id. ¶ 1754d, at 306.

Generally, if a class can introduce an announcement that creates an inference of conditioning, class certification would be appropriate because the common issue of conditioning would predominate.  See Little Caesar Enters., Inc., 172 F.R.D. at 265;

<u>see also</u> 4 <u>Newberg</u> § 18.30, at 18-114 ("Evidence of an unremitting policy of tie-in . . . may also be proffered to show classwide coercion.")

With this jurisprudence in mind, I proceed to address plaintiffs' announced tying claim.

(ii). <u>Plaintiffs' proof</u>

Plaintiffs contend that in January 1999, SNE, in a written response to dealers' concerns about option-packing, "announced" a uniform, company-wide policy of tying purchases of discretionary vehicles to purchases of accessories for those vehicles. <u>See</u> <u>Tr.</u> at 18-20; SNE Response at 7 (stating that "SNE pre-accessorizes our demonstrators . . . and any discretionary vehicles determined in accordance with current allocation procedures"). Unsur-prisingly, plaintiffs intend to offer the purported announcement into evidence.

While an announcement, assuming it explicitly states the tying condition, is itself sufficient to create an inference of conditioning, plaintiffs intend to bolster this inference with other documentary and testimonial evidence showing that SNE implemented its announced policy of conditioning on a class-wide basis. <u>See</u> 4 <u>Newberg</u> § 18.30, at 18-114 ("Allegations of such a

-27-

policy [of conditioning] may be insufficient . . . and the plaintiff should bolster such charges with evidence such as classwide adherence to the tie-in policy."). This additional evidence will allegedly show that SNE: (1) pre-installed accessories on discretionary vehicles, see, e.g., Dep. of Donald Smith, Jr. ("Smith Dep."), Ex. 1 to Pls.' Reply Memo. Supporting Class Certification (hereinafter "Pls.' Reply"), (Doc. No. 183), at 114-16; 135-36; and (2) enthusiastically encouraged DSM's to aggressively market accessories to dealers, see, e.g., Memo. from Joseph Appelbe to John Seybold and DSM's of 6/3/1998, Ex. 2 to Pls.' Reply.

(iii). <u>The proposed defense</u>

Presumably, defendants will attempt to rebut any inference of conditioning created by the alleged announcement by pointing out ambiguities and qualifiers in the document itself. See <u>Trans Sport, Inc.</u>, 964 F.2d at 192 (holding that company's policy statement did not establish tying arrangement because it was ambiguous and the plaintiff offered no evidence that it was ever implemented). In addition, defendants will offer the testimony of SNE employees that the tying condition was not implemented on a class-wide basis. <u>See</u> Lustbader Aff. ¶¶ 16-20; <u>Trans Sport,</u>

-28-

Inc., 964 F.2d at 192; Areeda ¶ 1754d, at 306.  For example, Phillip L. Lustbader, SNE's Vice President of Operations and Dealer Relations, stated in an affidavit that while SNE pre-accessorizes some discretionary vehicles in various ways, and offers those vehicles for sale to dealers, other discretionary vehicles are accessorized only after consultation with, and agreement by, dealers.  Lustbader Aff. ¶¶ 17-20; see also Aff. of James Shea, submitted with Defs.' Objection.

Defendants will also offer testimony that individual dealers negotiated agreements with SNE to purchase discretionary vehicles without having to purchase accessories on those vehicles.  See Tr. at 70; Areeda ¶ 1754d, at 306 (stating that an inference of conditioning can be rebutted if a defendant shows "that buyers frequently and successfully requested" that the tied and tying products be offered separately); see also 4 Newberg § 18.30, at 18-114.

The weight of this evidence, defendants argue, will successfully rebut any inference of conditioning created by plaintiffs' evidence.  Tr. at 70-72; see Areeda ¶ 1754d, at 306.

Defendants contend that, since they can offer evidence that will rebut the presumption of conditioning created by the tying

-29-

announcement, plaintiffs will have no choice but to offer individual proof of conditioning. Thus, they claim, the trial will degenerate into a series of mini-trials focusing on whether individual dealers were forced to purchase unwanted accessories on discretionary vehicles. Tr. at 77-78, 101. Under these circumstances, individual questions, such as dealer intent, will predominate over questions common to the class.

### (iv). Analysis

As plaintiffs' case is presently formulated, it focuses on documentary and testimonial evidence establishing that defendants had an announced policy of pre-accessorizing discretionary vehicles and conditioning all dealers' purchases of those vehicles on the purchase of those accessories. Under these circumstances, common issues predominate over individual issues. See Little Caesar Enters., Inc., 172 F.R.D. at 265 ("[T]he critical question for Rule 23(b)(3) is whether the method of proving [conditioning] involves facts -- even if complex and external to the contract -- that are predominantly common to the class and not individual.").

In response, defendants ask that I: (1) evaluate the merits of their proposed defense and conclude that it successfully

rebuts any presumption of conditioning; and (2) predict that, in response, plaintiffs will offer the individual testimony of dealers in an attempt to prove conditioning. I reject this argument for two reasons.

First, while I may "formulate some prediction as to how specific issues will play out in order to determine" whether class certification is appropriate, see Mowbray, 208 F.3d at 298, the Supreme Court has held that I may not evaluate the merits of a case at the class certification stage. See Eisen, 417 U.S. at 177. There is "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." Id. If I were to deny class certification because of my own evaluation of the merits of the defendants' proposed defense, I would be unduly prejudicing the plaintiffs, who have satisfied the requirements of Rule 23. Cf. id. (noting that a preliminary determination on the merits might result in substantial prejudice to a defendant).

Second, even if I were to make a preliminary determination of the merits of the proposed defense, I would be unable, at this time, to determine whether the defendants could successfully

rebut any inference of conditioning created by the alleged announcement. Defendants have not said which, or how many, dealers would testify that they negotiated agreements with SNE to purchase discretionary vehicles without having to purchase accessories on those vehicles. Nor have defendants offered any details about that testimony. Nor can I fully discern the impact of the proffered testimony of Lustbader and other SNE employees. Nor can I fully evaluate the import of the common proof that plaintiffs will introduce to buttress any inference of conditioning raised by the alleged announcement. While defendants may indeed have a strong defense and may well prevail at the summary judgment stage of the litigation, these and other deficiencies in the record would necessarily prevent me from reaching any preliminary determination as to the merits of their proposed defense.[5]

Because I find that plaintiffs can offer common proof of

---

[5] Further, even if defendants successfully rebut the presumption of conditioning, there is no guarantee that the plaintiffs would offer individual dealer testimony. Indeed, at oral argument plaintiffs suggested that they might not offer such testimony. Tr. at 21. Creative lawyering leaves open the prospect of other methods of proof. See Bogosian, 561 F.2d at 452; Little Caesar Enters., Inc., 172 F.R.D. at 253.

conditioning, I conclude that their announced tying claim satisfies the requirements of Rule 23 and is appropriate for class certification.

b.   Temporal Constraints

By its very terms, a cause of action based on an alleged announced tie applies only to purchases made after the announcement.  See Areeda ¶ 1754b, at 302-03; ¶ 1754d, at 305-06. In this case, SNE allegedly announced the existence of a tie on January 21, 1999.  See SNE Response.  Accordingly, in the event of a finding of liability, only those dealers who purchased discretionary vehicles from SNE on or after January 21, 1999 may recover damages from SNE under an announced tie theory.

2.   The Unannounced Tying Claim

Plaintiffs also allege that SNE conditioned dealers' access to discretionary vehicles (the tying product) on their purchase of accessories (the tied product) on desirable non-discretionary vehicles which dealers needed to maintain profitable dealerships (the lock-in product).  See George Lussier Enters., Inc., 1999 WL 1327396, *2-6 (discussing this claim).  Because plaintiffs can point to no direct evidence to support their unannounced tying claim, they rely instead on circumstantial evidence of

conditioning. <u>Tr.</u> at 26-27. As was the case with the announced tying claim, the parties disagree as to whether plaintiffs' proposed means of proving conditioning will make their unannounced tying claim suitable for class certification.

In essence, defendants advance two alternative arguments in opposition to plaintiffs' motion to certify the unannounced tying claim. First, they contend that because no explicit tying contract or announcement exists, plaintiffs <u>must</u> offer individual dealer testimony to prove class-wide conditioning. Thus, they contend that individual questions of dealer intent will necessarily predominate over questions common to the class.

Second, defendants contend that, even if it were hypothetically possible for plaintiffs to prove class-wide conditioning in the absence of either: (1) an express tying contract or announcement; or (2) individual dealer testimony, plaintiffs' proposed method of proof is not sufficient to do so. Therefore, defendants argue, plaintiffs' motion for class certification should be denied.

After addressing defendants' first argument, I will then review plaintiffs' proposed means of proof, the proposed defense, and, ultimately, analyze defendants' second argument.

a.   Common Proof of Conditioning - Generally

Defendants' initial argument is at odds with case law which holds that a class may prove conditioning, without relying on either an explicit tying announcement or individualized testimony, by showing that the "practical economic effect" of a contract or contracts is to create a tying arrangement even though the contracts do not, on their face, explicitly condition the purchase of one product on the purchase of another.  See Bogosian, 561 F.2d at 452; see also Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia, 815 F.2d 1407, 1418 (11th Cir. 1987) ("It is well established that coercion may be established by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product." (citations omitted)).

For example, in Bogosian v. Gulf Oil Corp., a proposed class of independent gas station operators sued their lessors, alleging that their lease agreements tied the leasing and subleasing of gas station sites to the purchase of gasoline supplied by each dealer's lessor.  561 F.2d at 439.  While no single lease provision required the lessee to purchase all of its gasoline from the lessor, the leases provided: (1) for terms of only six

to twelve months; (2) that the lessee had to purchase a license to use the lessor's trademark and, as a condition of that license, the lessee was required to sell only the lessor's gasoline from any pump bearing the lessor's trademark; (3) that the lessor could make no alteration of the leasehold without the lessor's approval; and (4) that the lease could be terminated whenever the lessee failed to purchase a stated quantity of gasoline from the lessor. Id. at 452. The district court refused to certify the class because, since there was no express contractual tie in the leases, the plaintiffs would have to show that each lessee was coerced into purchasing the lessor's gasoline. See id. at 452 (discussing district court opinion).

The Third Circuit vacated the district court's opinion because it concluded that the plaintiffs need not offer individualized proof of coercion to establish the existence of a tying claim. Id. at 452. The Court noted that the "[p]laintiffs do not contend that defendants pressured them into refraining from selling competing brands, but that the lease contracts themselves precluded them from doing so." Id. at 452. The defendants acknowledged that while the leases did not explicitly establish any tying arrangement, under the terms of those leases

the only way that a lessee could sell other brands of gasoline would be to install his own pumps and tanks. Id. at 452. The Court went on to say that:

> Whether such a course is realistically open to a short term lessee is a common question of fact which can be developed by expert testimony concerning the relative costs and benefits of making such installations. Similarly, a lease provision which permits termination of the lease when a stated quantity of gasoline is not purchased from the lessor hardly leaves the lessee open to reject some or all of the lessor's gas in favor of that of a competitor. If plaintiffs are able to show that the lease agreements in use by all defendants have similar clauses which have the practical economic effect of precluding sale of other than the lessor's gasoline, they will have shown that the purchase of gasoline was tied in to the lease of the service station. Under these circumstances the lease agreement itself conditions the sale of one product (here a lease) upon purchase of another [and therefore the plaintiffs need not prove individualized conditioning].

Id. at 452 (emphasis added).

Thus, Bogosian supports the proposition that class certification is appropriate where a class can establish by common proof that the practical economic effect of a contractual arrangement is to condition the purchase of one product on the purchase of another. See id. at 452.

b. Plaintiffs' Proposed Proof of Conditioning

-37-

Plaintiffs, relying on <u>Bogosian</u>, seek to prove conditioning on a class-wide basis by showing that the practical economic effect of their relationship with SNE was that dealers' access to discretionary vehicles was conditioned on their purchase of accessories on non-discretionary vehicles. Plaintiffs intend to prove this practical economic effect in two ways.

First, plaintiffs intend to offer the expert testimony of Michael J. Wagner, who will show through regression analysis that dealers purchased accessories at a loss. <u>See</u> Expert Report of Michael J. Wagner, submitted with Pls.' Motion. Plaintiffs contend, based on the assumption that dealers act in their economic self-interest, that this testimony supports an inference that the purchase of discretionary vehicles was conditioned on the purchase of these accessories. <u>Tr.</u> at 50-51; <u>see</u> <u>Ungar</u>, 531 F.2d at 1225 (finding that while proof that large numbers of buyers purchased a financially burdensome product does not by itself establish conditioning, such proof might be relevant under other circumstances).

Second, plaintiffs also intend to offer the testimony of former SNE employees, including Don Smith. <u>Tr.</u> at 24-26. Smith is apparently prepared to testify: (1) that SNE took adverse

actions against Subaru of Wakefield for failing to purchase accessories; and (2) that SNE had a policy of aggressively marketing certain accessories to dealers. See Smith Dep. at 56-60, 91-96.

Plaintiffs acknowledge that the testimony of Wagner and Smith, even when taken together, may not be sufficient to demonstrate conditioning on a class-wide basis. See Bogosian, 561 F.2d at 451; Ungar, 531 F.2d at 1225; Auto Ventures, Inc. v. Moran, Case No. 92-436-CIV-Kehoe, 1997 U.S. Dist. LEXIS 7037, *10 (S.D. Fla. Apr. 3, 1997) (finding no support for the proposition that former employee testimony suffices to establish conditioning on a class-wide basis); see also Petrolera Caribe, Inc. v. Avis Rental Car Corp., 735 F.2d 636, 638 (1st Cir. 1984) (per curiam) (noting that proof that a high percentage of purchasers actually bought the tied product "would be insufficient, standing alone, to demonstrate" conditioning (citing Ungar, 531 F.2d at 1213, 1225 n.14)). Therefore, plaintiffs may decide to "present additional individual evidence by individual dealers" in an attempt to satisfy their burden of proof. Pls.' Reply, at 11; see Tr. at 29.

Plaintiffs contend that this individual dealer testimony,

when coupled with the other class-wide circumstantial evidence discussed above, proves conditioning and satisfies the requirements of Rule 23. See Tr. at 29; cf. Martino, 81 F.R.D. at 88-89 (finding that the cumulative effect of former employee testimony and documentary evidence "induces us to hold that proof of coercion can be presumed to be classwide.").

        c.    The Proposed Defense

In response, defendants will offer the testimony of SNE employees and current and/or former dealers to show that dealers purchased accessories for individual reasons having nothing to do with coercion. See Lustbader Aff. ¶¶ 11-14; Shea Aff. ¶¶ 8-11, 19-20; see also Defs.' Surreply, at 5 n.3 (disputing the credibility and sufficiency of Smith's testimony). Defendants will also contest the methodology and conclusions of Wagner, through both cross-examination and their own expert testimony. See, e.g., Report of Jeffrey S. Gray, submitted with Defs.' Objection.

Defendants argue that, because the class will offer the testimony of individual dealers, the trial will become a series of mini-trials concerning the purchases of those individual dealers. Accordingly, common issues will not predominate over

individual issues and class certification is not appropriate under Rule 23(b)(3). See, e.g., Waldo v. North American Van Lines, Inc., 102 F.R.D. 807, 814 (W.D. Pa. 1984); Chase Parkway Garage, Inc., 94 F.R.D. at 332; Rental Car of New Hampshire, Inc., 496 F. Supp. at 378; Schuler, 74 F.R.D. at 87.

d.    Analysis

Where a class seeks to prove conditioning solely through the testimony of individual purchasers, individual questions of "coercion"[6] predominate and class certification ordinarily is not

_____

[6] When the facts of a case dictate that a class can not offer common proof of conditioning, each individual class member must offer "some proof that [he] did not accept the tied product voluntarily, but was forced to take it." See Antitrust Law Developments, supra, at 188. Courts often refer to this as a need to prove conditioning via a showing of "coercion." See, e.g., Petrolera Caribe, Inc., 735 F.2d at 638 ("As there is no express contractual tie, [the plaintiff] must prove 'coercion.'" (citation omitted)); see also Areeda ¶ 1752e, at 283-86 (discussion coercion); Antitrust Law Developments, supra, at 188-89 (same); William C. Holmes, Antitrust Law Handbook 432-33 (1999 ed.) ("Common paraphrasings of the [conditioning] requirement are that "coercion" or "forcing" must be proven.").
     To prove "coercion," an individual buyer must show that he did not want to purchase the tying product but he did so only because the seller conditioned his purchase of the tied product, through, for example, threats, pressure or intimidation, on his purchase of the tying product. See Bogosian, 561 F.2d at 451. Thus, unlike common proofs of conditioning, which focus on the seller, this inquiry focuses on: (1) the buyer's state of mind as to the desirability of both the tied and tying product; and (2) her interactions with the seller.

appropriate.  See generally 4 Newberg § 18.30, at 18-108 n.165

(collecting cases).  In this case, however, plaintiffs may offer

individualized proof of coercion to buttress their class-wide

proof of conditioning.  Cf. Martino, 81 F.R.D. at 88-89 (holding

that the cumulative effect of documentary and testimonial

evidence established class-wide proof of conditioning).  After

reviewing the relevant case law and the record in this case, I

conclude that plaintiffs' unannounced tying claim satisfies the

requirements of Rule 23(b)(3).

First, although plaintiffs wisely reserved the option of

offering individual dealer testimony as circumstantial evidence

of conditioning, the expert testimony of Wagner and the testimony

of former SNE employees may prove to be sufficient evidence that

the practical economic effect of the contractual relationship

between SNE and its dealers was to condition the purchase of

desirable, non-discretionary vehicles on their purchase of

accessories on discretionary vehicles.  Cf. Tic-X-Press, Inc.,

_____

Courts are reluctant to certify a class where conditioning
must be established by individualized instances of coercion
because individual questions as to a buyer's state of mind and
the nature of her interactions with the seller tend to
predominate over issues common to the class.  See, e.g., Ungar,
531 F.2d at 1226; Chase Parkway Garage, Inc., 94 F.R.D. at 332.

815 F.2d at 1418; <u>Bogosian</u>, 561 F.2d at 452; <u>Martino</u>, 81 F.R.D. at 88-89. Although defendants take issue with Wagner's methodology, assumptions, and preliminary findings, the need to make a class certification decision "[a]s soon as practicable after the commencement of an action," Fed. R. Civ. P. 23(c)(1), necessarily implies that, in some cases, the parties' offers of proof will not be fully developed at the time of the certification decision. <u>Cf.</u> <u>Mowbray</u>, 208 F.3d at 298. If, at a later date, it becomes obvious that plaintiffs will be required to offer individual dealer testimony, I may reassess whether such testimony alters my conclusion as to the predominance requirement of Rule 23(b)(3). <u>See</u> Fed. R. Civ. P. 23(c)(1) (stating that a class certification order "may be altered or amended before the decision on the merits").

Second, because plaintiffs intend to offer dealer testimony, if at all, as a supplement to other circumstantial evidence, they need not offer the testimony of every single member of the class. They may choose to group dealers with similar experiences and offer only a few representative dealers as witnesses. Under such circumstances, I cannot say that individual questions would

necessarily predominate over questions common to the class.[7]

Ultimately, it is difficult to say definitively whether common questions will predominate with regard to plaintiffs' unannounced tying claim. But see Mowbray, 208 F.3d at 298 (stating that, as a general matter, when a court finds that an issue which requires individualized factfinding is unlikely to survive summary judgment, the court should conclude that the issue does not undermine the predominance of common issues). I note, however, that "because of the important role that class actions play in the private enforcement of the antitrust statutes, courts resolve doubts about whether a class should be created in favor of certification." Lease Oil Antitrust Litig., 186 F.R.D. 403, 419 (S.D. Tex. 1999) (collecting cases); see Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 378 (S.D.N.Y. 1996).

---

[7] In Bogosian, the court stated that "if class certification is granted, plaintiffs will be precluded from introducing evidence of threats of termination to prove the existence of a tie-in." 561 F.2d at 452-53 n.12. Accordingly, defendants argue that I should bar plaintiffs from introducing any individual testimony in support of their unannounced tying claim. Because I find, however, that it is conceivable that individual dealer testimony could be offered in this case without upsetting the predominance of common issues, I reject defendants' argument.

After careful analysis of the parties' arguments, and given the factors discussed above, I find that the plaintiffs' unannounced tying claim satisfies the requirements of Rule 23(b)(3). Accordingly, I grant plaintiffs' motion for class certification with regard to this claim.

3. The ADDCA Claims

Plaintiffs allege that the same course of conduct which comprises their tying claims also gives rise to claims under the Automobile Dealer Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 et seq. In order to prevail on their ADDCA claims, plaintiffs must show that: (1) they are automobile dealers; (2) defendants are automobile manufacturers engaged in commerce; (3) they and defendants have a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) they were wrongfully injured by defendants' actual or threatened coercion or intimidation. See Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 93 (3d Cir. 2000); General GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306, 308 (1st Cir. 1990) (discussing coercion and quoting H.D. Corp. of Puerto Rico v. Ford Motor Co., 791 F.2d 987, 990 (1st Cir. 1986)); Wallace Motor Sales, Inc. v. Am. Motors Sales Corp., 780 F.2d 1049, 1056 (1st Cir. 1985)

(discussing coercion).

The parties do not dispute, and I agree, that the first three elements of plaintiffs' ADDCA claims are readily amenable to common proof. As was the case with the tying claims, the parties disagree as to whether plaintiffs can offer common proof of coercion.

Courts characterize the ADDCA as a "supplement to the national antitrust laws" that was intended to "counter-balance the economic leverage" that vehicle manufacturers have over dealers. Northview Motors, Inc., 227 F.3d at 92-93. Accordingly, courts often rely on antitrust jurisprudence when interpreting the coercion element of an ADDCA claim. See, e.g., Lockwood Motors, Inc., 162 F.R.D. at 581 n.11. Thus, as is the case with tying claims: (1) where plaintiffs can offer common proof of coercion, the predominance requirement of Rule 23(b)(3) is satisfied; and (2) where plaintiffs must offer individualized evidence of coercion, the predominance requirement is not satisfied. See id. at 580-81; Larry James Oldsmobile-Pontiac-GMC Truck Co., Inc. v. General Motors Corp., 164 F.R.D. 428, 439 (N.D. Miss. 1996).

Since the legal question of coercion under the ADDCA is

substantially similar to the question of conditioning discussed above with respect to plaintiffs' tying claims, plaintiffs will offer the same proof with regard to both their ADDCA and tying claims. Accordingly, since I have already concluded that plaintiffs tying claims satisfy the requirements of Rule 23(b)(3), I conclude that plaintiffs' ADDCA claims satisfy the requirements of Rule 23(b)(3) as well.

4. The RICO Claims

In their Second Amended Complaint, Plaintiffs allege that SNE, Boch, and Appelbe engaged in a pattern of racketeering in violation of the civil RICO statute, 18 U.S.C. § 1962(c). See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985) (identifying the elements of a § 1962(c) claim). To be liable under § 1962(c), a person must: (1) "conduct or participate . . . in the conduct" of (2) an "enterprise" (3) through a "pattern" (4) of "racketeering activity."[8] Id.; Bessette v. AVCO Financial

_____

[8] In a prior Memorandum and Order, I concluded that, based on the allegations contained in plaintiffs' initial complaint, "neither the New England Subaru Dealer Network nor Subaru of America can satisfy the enterprise element of the dealers' § 1962(c) claims against SNE." George Lussier Enters., Inc., 2000 WL 1466132, *5. Accordingly, I granted SNE's motion to dismiss Count I of plaintiffs' initial complaint. Id. At this time, however, defendants do not challenge the sufficiency of this

-47-

Servs., Inc., 230 F.3d 439, 448 (1st Cir. 2000), cert. denied, 121 S.Ct. 2016 (2001). Defendants contend that the "racketeering activity" alleged by plaintiffs, namely, the predicate acts of extortion and mail and wire fraud, are not amenable to common proof, thereby defeating any showing of predominance under Rule 23(b)(3). See 18 U.S.C. § 1961(1) (listing predicate acts which constitute racketeering activity). I analyze each claim in turn.

> a.   Extortion

Plaintiffs allege that defendants engaged in a pattern of extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. Cplt. ¶ 67. Specifically, they claim that SNE had a firm policy of forcing all dealers to purchase accessories, by threatening them with a number of forms of retaliation, including: (1) reduced allocations of discretionary vehicles; (2) the imposition of unreasonable performance standards, which, if not met, would result in the termination of a dealers' Subaru franchise; and (3) establishing unreasonable warranty repair requirements and withholding payment to dealers who do not comply with those requirements. Id. ¶¶ 68-102.

––––––––––––––––––––

aspect of plaintiffs' Second Amended Complaint. See Eisen, 417 U.S. at 177.

In support of this claim, plaintiffs will offer much of the same class-wide proof as discussed above with regard to their tying claims, including: (1) internal SNE documents which allegedly describe a plan to extort dealers into purchasing unwanted accessories; and (2) the testimony of former SNE employees as to SNE's alleged class-wide policy of extortion. Since plaintiffs will offer class-wide proof in support of questions common to the class, I conclude that this claim satisfies the requirements of Rule 23(b)(3).

b.   Mail and Wire Fraud

Plaintiffs also allege that defendants engaged in a pattern of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Cplt. ¶¶ 103-124.  Specifically, plaintiffs allege that defendants sent dealers the following documents:  dealer agreements; agreement renewals; and memoranda and letters explaining SNE's policies, including its vehicle allocation policies.  Id.  These documents were sent, in substantially identical form, to all dealers, with the exception of two alleged misrepresentations which were only made to two dealers.  See Cplt. ¶¶ 113, 120 (alleging specific misrepresentations made to two individual dealers).

Plaintiffs contend that these documents contained misrepresentations about SNE's policies. For example, plaintiffs allege that SNE misrepresented the way it allocates vehicles to dealers and how and when it accessorizes vehicles. See George Lussier Enters., Inc., 2000 WL 1466132, *7-8 (discussing earlier claims against Boch).

To prove that defendants violated the mail or wire fraud statutes, plaintiffs must show that: (1) defendants knowingly and willingly participated in a scheme or artifice to defraud the plaintiffs out of money, property, or the right to receive honest services; and (2) the mails or interstate wire communications were used in furtherance of the scheme. See United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997) (mail fraud); United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997) (wire fraud); see also United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996) (noting the similarity of language in these statutes).

Courts disagree as to whether a plaintiff bringing a civil RICO claim predicated on mail or wire fraud must also prove

detrimental reliance as an element of her claim.[9]  See Sebago,

Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 81-85 (D. Mass.

1998) (addressing the split of authority and adopting the

minority position that detrimental reliance need not be proved).

I need not take a position on this issue, however, because

plaintiffs allege that they did, in fact, detrimentally rely on

at least some of the alleged misrepresentations made by SNE.  See

Cplt. ¶ 106 ("Each plaintiff relied on these representations [in

the Dealer Agreements] in entering into its respective Dealer

Agreement and in becoming a Subaru dealer, all to their

detriment.").  Thus, the relevant question before me is whether

plaintiffs' need to prove reliance means that individual

questions of reliance will predominate over issues common to the

class.

The overwhelming majority of plaintiffs' allegations focus

---

[9]  This disagreement is significant in the class
certification context because, in many cases, proof of reliance
will require a searching, individualized inquiry that defeats a
finding of predominance.  See, e.g., Rothwell, 191 F.R.D. at 31
(agreeing with "the majority view that certification generally is
inappropriate where individual reliance is an issue" and finding
that the predominance requirement was not satisfied).  Issues of
reliance can be especially troublesome where the plaintiffs base
their claims "on oral misrepresentations, which, by their nature,
tend to be particularized."  Id. at 30 (citations omitted).

on documents sent by defendants to all dealers concerning company policies applicable to all dealers. In essence, plaintiffs allege "that defendants engaged in a common course of misrepresentations designed to affect all plaintiffs in a like fashion." Iron Workers Local Union No. 17 Ins. Fund v. Phillip Morris Inc., 182 F.R.D. 523, 540 (N.D. Ohio 1998). Therefore, plaintiffs' claims focus on defendants' class-wide conduct, not on defendants' individual interactions with dealers. See id. at 541.

Thus, plaintiffs' claims are readily distinguishable from those cases where individual issues of reliance were found to predominate over issues common to the class because the plaintiffs alleged that they relied on unique, oral misrepresentations made in the context of individual transactions. Cf., e.g., Rothwell, 191 F.R.D. at 27-28, 30-32 (finding, in a consumer class action against an insurance company, that individual issues of reliance predominated because the court's inquiry would focus on differing oral representations made between agents and prospective policy holders). Unlike those cases, plaintiffs' claims focus on objective, documentary evidence common to the class. See Walco Inv., Inc. v. Thenen,

168 F.R.D. 315, 335 (S.D. Fla. 1996) (finding predominance in civil RICO claim predicated on wire fraud where claims focused on a "common scheme" of "substantially identical" documents); Iron Workers Local Union No. 17 Ins. Fund, 182 F.R.D. at 540 (finding predominance in civil RICO claim predicated on mail fraud where defendants engaged in a common course of misrepresentations).

Some members of the class will need to testify, on behalf of the class, that they detrimentally relied on the defendants' alleged misrepresentations. See Iron Workers Local Union No. 17 Ins. Fund, 182 F.R.D. at 537. The difficulty in proving reliance, however, will vary from allegation to allegation. For example, one could readily infer that dealers, when entering into or renewing their dealer agreements, relied on SNE's assurances that it would allocate vehicles fairly. See Singer v. AT&T Corp., 185 F.R.D. 681, 691 (S.D. Fla. 1998) (finding that a "uniform written price representation . . . provide[d] a sufficient basis upon which reliance may be presumed" in a RICO class action based on mail and wire fraud); Smith v. MCI Telecomm. Corp., 124 F.R.D. 665, 679 (D. Kan. 1989) (finding that, where class members must have relied on written representations made to them in commissions plans that they

signed upon initiating or continuing their employment with the defendant, that reliance was an "objective inquiry common to the entire proposed class").

Given the substantially identical nature of the written misrepresentations allegedly made by defendants, I conclude that the issue of detrimental reliance is common to the class and susceptible to common proof.  See Iron Workers Local Union No. 17 Ins. Fund, 182 F.R.D. at 537; Walco Inv., Inc., 168 F.R.D. at 335; Singer, 185 F.R.D. at 691; Smith, 124 F.R.D. at 679. Accordingly, I grant plaintiffs' motion to certify these claims.

5.  The State Dealer Act Claims

Plaintiffs allege that the same course of conduct which comprises their tying claims also violates the automobile dealer protection statutes of Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont because the dealers were coerced into purchasing unwanted accessories.  Cplt. ¶¶ 185-195. Although the wording of these statutes differs, they all generally prohibit a vehicle manufacturer or distributor from requiring a dealer to purchase unwanted accessories or vehicles. See Conn. Gen. Stat. § 42-133bb(2); Mass. Gen. L. Ch.93B § 4(2)(a); 10 Me. Rev. Stat. § 1174(2)(A); N.H. Rev. Stat. 357-C:3,

-54-

II(a); R.I. Gen. Laws § 31-5.1-4(b)(1); 9 V.S.A. § 4096(1). Therefore, plaintiffs will offer the same evidence in support of these claims that they will offer in support of their tying claims.

While I recognize that there may be different affirmative defenses or procedural requirements, such as exhaustion of administrative remedies, relevant to claims under each state statute, there is no "per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." Mowbray, 208 F.3d at 296 (rejecting the argument that the need for individualized statute-of-limitations determinations among class members automatically defeats a motion for class certification); see 1 Newberg § 4.26, at 4-105-06 (stating that challenges to predominance based on "the presence of affirmative defenses against various class members . . . will not usually bar a finding of predominance of common issues"). If any such unique defenses apply to members of the class, they may be asserted at the damages stage of this proceeding. See 1 Newberg § 4.26, at

4-104-05 (observing that issues that "go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability" generally do not bar a finding of predominance).

Since plaintiffs will offer the same proof in support of their state dealer protection act claims as they will in support of their tying claims discussed above, I find that common issues predominate with regard to these claims. Therefore, I grant plaintiffs' motion for class certification of these claims.

6. The Breach of Contract Claims

Plaintiffs allege that SNE, by engaging in option packing, breached its contractual obligations to dealers to: (1) perform its contractual duties in a lawful and ethical manner; and (2) allocate vehicles to dealers using appropriate factors. Cplt. ¶¶ 196-200. These obligations are contained in materially uniform dealer agreements entered into between SNE and each of its dealers. See SNE Dealership Agreement and Standard Provisions, Ex. F to Defs.' Surreply.

The issue of whether SNE's conduct towards dealers constituted a breach of those agreements presents questions of law and fact common to the class. See Collins, 168 F.R.D. at

676. Since plaintiffs will offer common proof, i.e., the same proof that they will offer in support of their tying claims, in support of their breach of contract claims, I find that common issues predominate with regard to these claims. See id. at 676 (certifying breach of contract claims despite lack of identical language in franchise agreements). Therefore, I grant plaintiffs' motion for class certification of these claims.

**D.   Damages**

Although issues common to the class predominate over individual issues on the question of liability, the amount of damages suffered by individual dealers presents individual questions of fact. See generally 1 Newberg § 4.26. The damages suffered by an individual dealer will depend upon, among other factors: (1) the length of the dealer's relationship with SNE; and (2) the number and cost of unwanted accessories purchased by the dealer. In addition, the presence of individualized defenses may negate the availability of an award of damages to some class members on some claims.

While the presence of individualized issues of damages does not necessarily defeat a motion for class certification, I conclude that in this case the issues of liability and damages

-57-

should be bifurcated. See 1 Newberg § 4.26, at 4-90-96. Accordingly, I certify the plaintiffs' proposed class as to issues of liability only. If defendants are found liable, claims for damages may be resolved through individual trials or in groups as subclasses. See Fed. R. Civ. P. 23(c)(4); Manual for Complex Litigation (Third) § 30.15 (1995).

## IV. CONCLUSION

After reviewing plaintiffs' claims, their proposed means of proof, and the proposed defenses to these claims, I find that the liability aspect of plaintiffs' claims satisfies the requirements of Rule 23(b)(3). Accordingly, I grant plaintiffs' motion for certification of the following class for purposes of determining defendants' liability: "those entities or individuals who own or owned a New England Subaru dealership between January 1, 1995 and the present." I deny plaintiffs' additional request that I also certify the class pursuant to Fed. R. Civ. P. 23(b)(2). Plaintiffs' motion for class certification, (Doc. No. 168), is therefore granted in part and denied in part. Plaintiffs shall provide notice to all potential class members in a manner consistent with Fed. R. Civ. P. 23(c)(2).

-58-

By agreeing to certify a class, I do not take a view as to the merits of defendants' anticipated motions for summary judgment.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge


August 3, 2001

cc:  Richard McNamara, Esq.
     Michael Harvell, Esq.
     Howard Cooper, Esq.
     William Kershaw, Esq.
     Steven W. Kasten, Esq.